# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**U.S. UNITED OCEAN SERVICES, LLC**          **CIVIL ACTION**

**VERSUS**                                   **NO. 11-2316**

**POWERHOUSE DIESEL SERVICES, INC.**         **SECTION: "G"(2)**

## ORDER AND REASONS

Before the Court is Defendant Powerhouse Diesel Services, Inc.'s ("Powerhouse") Motion to Transfer Venue.[1] After considering the motion, the memorandum in support, the opposition, the reply, the record, and the applicable law, the Court will grant the motion.

## I. Background

### A. Factual Background

On July 22, 2010, Plaintiff U.S United Ocean Services, LLC ("UOS") and Defendant Powerhouse entered into an "Overhaul and Performance Agreement for M/V MARY ANNE HUDSON Main Engines," (hereinafter "the Agreement").[2] Pursuant to the Agreement, Powerhouse was to repair the port and starboard main propulsion engines of UOS's ocean going vessel the M/V MARY ANN HUDSON. The work was to be performed in two phases. During Phase One, Powerhouse was to "construct, manufacture, re-manufacture, or obtain four (4) engine blocks as well as other parts and components necessary to perform the Work."[3] According to UOS, "Phase One was to be considered completed under the Agreement upon the stowage and securing of the four (4) engine blocks and their ABS certified parts and components into the cargo containers and onto the

---

[1]  Rec. Doc. 54.

[2]  Rec. Doc. 1 at ¶ 7.

[3]  *Id.* at ¶¶ 8-9.

rail carriers in Benicia, California, for transport to New Orleans, Louisiana for inspection, then ultimately to a shipyard in Verzcruz, Mexico, aboard the M/V MARY ANNE HUDSON," all no later than December 31, 2010.[4]

UOS contends that during Phase Two of the Agreement, Powerhouse was to "oversee and direct the disassembly, repairs, and reassembly of both main engines at the shipyard," which was to begin "when the first engine block, part or component shipped aboard the M/V MARY ANN HUDSON was unsecured from its position on the vessel in preparation for the Work at the shipyard."[5] The Agreement originally called for a total contract price of $2,400,000.00 to be paid in five installments. The first installment of $840,000.00 was paid by UOS to Powerhouse on July 30, 2010, and the second installment of $600,000.00 was not due, according to UOS, until after the completion of Phase One.[6] UOS claims that "it became apparent that Powerhouse Diesel was behind schedule for the completion of Phase One," and, in fact, later failed to meet the December 31, 2010 deadline.[7] Regardless, UOS contends that it made the second installment payment to Powerhouse for $600,00.00 on January 21, 2011.[8]

On February 15, 2011, the parties executed amendments to the Agreement, agreeing that "UOS's third, fourth and fifth payment installments were consolidated into two payments and the due dates were changed."[9] UOS paid Powerhouse $240,000.00 on February 27, 2011. UOS maintains

---

[4]   *Id.* at ¶ 11.

[5]   *Id.* at ¶ 12.

[6]   *Id.* at ¶ 13.

[7]   *Id.* at ¶ 14.

[8]   *Id.* at ¶ 15.

[9]   *Id.* at ¶ 16.

that the final payment of $720,000.00 "was not due until 'After the Successful Completion of Sea Trials, ABS Classing Certification / Approval of the Work, and Turnover of the M/V MARY ANN HUDSON to Owner.'"[10] UOS avers that Phase One of the work was not completed until approximately April 20, 2011, "after the vessel was in the shipyard, and approximately one-hundred and ten (110) days behind the deadline."[11] On May 20, 2011, the parties agreed upon a modification in the scope of the Agreement, whereby "the change order gave credit to UOS for certain parts, in consideration of additional parts used by Powerhouse Diesel in performing the Work, [and] the parties agreed to increase the Agreement's overall price by $80,000.00."[12] UOS also claims that "the parties agreed that the remaining $800,000.00 would be paid by UOS to Powerhouse Diesel in two equal payments. The first payment of $400,000.00 was paid by UOS on June 6, 2011. The final payment was due only 'After the Successful Completion of Sea Trials, ABS Classing Certification / Approval of the Work, and Turnover of the M/V MARY ANN HUDSON to Owner.'"[13]

On June 18, 2011 it was discovered that the engines at issue were not working properly. UOS asserts that "it was determined there were defects in the engines' crankcase blocks supplied by Powerhouse Diesel and installed on the vessel that prevented the engines from functioning properly."[14] UOS claims it provided Powerhouse with prompt notice of the defects on June 20, 2011, and on July 1, 2011, "UOS was informed by Powerhouse Diesel that they were demobilizing and withdrawing from the M/V MARY ANN HUDSON main engine project effective that date," before

---

[10]  *Id.*

[11]  *Id.* at ¶ 17.

[12]  *Id.* at ¶ 18.

[13]  *Id.*

[14]  *Id.* at ¶ 19.

the defects in the crankcase blocks had been corrected.[15] UOS avers that "[a]s a result of Powerhouse Diesel's refusal to complete the work per the terms of the agreement, UOS retained at its expense another company to complete Powerhouse Diesel's original scope of Work. The work was finally completed on July 19, 2011."[16] UOS brings a cause of action for breach of contract and seeks liquidated damages as outlined under the Agreement.

In the Answer filed by Powerhouse, it asserts several affirmative defenses.[17] In addition, Powerhouse brings a counterclaim, averring that "UOS failed to fulfill its contractual obligations in that it failed to otherwise order and/or procure additional component parts required for timely completion of the Work pursuant to the Agreement, and ultimately ordered said additional component parts from Powerhouse, which additional orders resulted in additional job growth and delays to the Work schedule in an amount no less that $400,000."[18] Moreover, Powerhouse contends that as a result of the May 20, 2011 change order, "Powerhouse and UOS agreed to an exclusive (sole source) parts and service agreement for the M/V MARY ANN HUDSON main engines for a five-year term for a fixed price list for parts and assemblies. UOS breached this exclusive parts and service agreement by ordering parts and services for the MARY ANN HUDSON from other vendors, thereby causing Powerhouse damages in the form of lost credits in an amount no less than $300,000."[19]

---

[15]   *Id.* at ¶¶ 20-21.

[16]   *Id.* at ¶ 22.

[17]   Rec. Doc. 5 at pp. 10-13.

[18]   *Id.* at p. 14.

[19]   *Id.*

4

***B. Procedural Background***

UOS initially filed suit in this matter on September 16, 2011, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332, and the case was assigned to Judge Martin L.C. Feldman, Section "F."[20] The case was subsequently reassigned to Section "G" as part of a new docket.[21] After discovering that UOS had improperly alleged the citizenship of itself as a limited liability company, on April 17, 2012, this Court ordered UOS to amend its complaint within ten (10) days to list the constituent members of the LLC to establish citizenship.[22] UOS amended its complaint, listing its sole member as another LLC, and then failed to allege properly the citizenship of that entity.[23] In response, this Court dismissed UOS's claims without prejudice on May 1, 2012.[24]

In a status conference held on May 16, 2012, UOS suggested that alleging citizenship would prove difficult, and instead requested leave to amend the complaint to allege maritime jurisdiction pursuant to Federal Rule of Civil Procedure 9(h).[25] Leave was granted and UOS filed its amended complaint on May 23, 2012.[26] Powerhouse answered the amended complaint on July 2, 2012.[27] The

---

[20] Rec. Doc. 1.

[21] Rec. Doc. 20.

[22] Rec. Doc. 22.

[23] Rec. Doc. 23.

[24] Rec. Doc. 24.

[25] Rec. Doc. 27.

[26] Rec. Doc. 28.

[27] Rec. Doc. 36.

Court granted two joint requests to extend expert report deadlines and to continue the September 24, 2012 trial date until June 3, 2013.[28]

Powerhouse filed the pending Motion to Transfer Venue on September 25, 2012, and it was initially set for submission on October 10, 2012.[29] The parties filed a joint motion to continue the submission date,[30] which the Court granted, extending the submission date until October 24, 2012.[31] UOS filed a memorandum in opposition to the pending motion on October 16, 2012.[32] Upon leave of Court, Powerhouse filed a reply.[33]

## II. Standard on a Motion to Transfer Venue

A motion to transfer venue from one federal district court to another is governed by 28 U.S.C. § 1404(a), which provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Thus, under 28 U.S.C. § 1404(a), there exists a threshold inquiry of whether the suit originally could have been brought in the venue where the action is sought to be transfered.[34] "This statute's purpose is to avoid the waste of time, energy, and money to protect litigants, witnesses, and the public against unnecessary inconvenience and expense."[35] Under this statute, the

---

[28] Rec Doc Nos. 35, 51.

[29] Rec. Doc. 54.

[30] Rec. Doc. 56.

[31] Rec. Doc. 57.

[32] Rec. Doc. 58.

[33] Rec. Doc. 62.

[34] *Volkswagen*, 371 F.3d at 203.

[35] *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

movant has the burden to demonstrate that a change of venue is warranted.[36] To prevail on a motion to transfer, the movant must demonstrate that the "balance of the convenience and justice factors substantially weighs in favor of transfer."[37] Therefore, when assessing the merits of a Section 1404(a) motion, a court must determine if the proposed transfer would make the suit substantially more convenient for the parties to litigate.[38] "The decision to transfer a pending case is committed to the sound discretion of the district court."[39]

In making this determination, a district court must consider both private and public interest factors. As articulated in *Volkswagen*, the private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.[40] The public interest factors consider: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law.[41] Unlike in a *forum non conveniens* analysis, the plaintiff's choice of venue is not afforded decisive weight.[42]

---

[36] *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966).

[37] *Reuter v. Jax, Ltd., Inc.*, 251 F.R.D. 231, 236 (E.D. Tex. 2007).

[38] *Gundle Lining v. Fireman's Fund Ins.*, 844 F.Supp. 1163, 1165 (S.D. Tex. 1994).

[39] *Id.* (citing *Van Dusen*, 376 U.S. at 616).

[40] 371 F.3d at 203.

[41] *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008).

[42] *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1987).

### III. Parties' Arguments

In its memorandum in support of the Motion to Transfer Venue, Powerhouse requests that this Court transfer this action to the Northern District of California pursuant to its authority under 28 U.S.C. § 1404(a).[43] Powerhouse argues that a motion to transfer venue should be granted when the proposed transferee venue is "clearly more convenient" than the venue chosen by plaintiff.[44] Moreover, Powerhouse contends that "a plaintiff's choice of venue is not a factor in the Section 1404(a) analysis."[45]

Powerhouse begins by explaining the threshold prerequisite for transfer under Section 1404(a), where the judicial district in which transfer is sought could have been a district in which the claim could have been filed.[46] To resolve this issue, Powerhouse avers that the Northern District of California would have subject matter jurisdiction over the dispute because this case is brought under admiralty and maritime jurisdiction pursuant to Federal Rule of Civil Procedure 9(h). Moreover, Powerhouse contends the Northern District of California would have had personal jurisdiction over the defendant, Powerhouse, because it is located in California.[47]

Next, Powerhouse claims that "transfer would serve the convenience of the witnesses."[48] Powerhouse emphasizes that "none of the 21 percipient witnesses disclosed by the parties resides in

---

[43] Rec. Doc. 54-1 at p. 4.

[44] *Id.* at p. 10 (citing *In re Volkwagen of Am., Inc.*, 545 F.3d 304, 314-15 (5th Cir. 2008) (en banc)).

[45] *Id.* (citing *Volkswagen*, 545 F.3d at 314-15).

[46] *Id.* at p. 11.

[47] *Id.* at pp. 11-12.

[48] *Id.* at p. 12.

this District, or anywhere in Louisiana for that matter."[49] Ten live within the Northern District of California, and one other lives in New Castle, California, "which is approximately100 miles from the Northern District of California courthouses in San Francisco and Oakland."[50] As a result, Powerhouse claims that trial in this District would greatly burden those witnesses who "would be forced to travel approximately 3,600 miles roundtrip and take several days away from their jobs and families."[51] Powerhouse believes that the inconvenience for these witnesses would be obviated if transfer were granted. In addition, Powerhouse claims that this Court should not consider this District as convenient because it resides in between the residences of all the witnesses when no witness actually resides in the district.[52]

Powerhouse advocates that "transfer would provide easier access to sources of proof."[53] Powerhouse maintains that despite technological advances allowing for the "relative inconvenience of transporting large amounts of documents across the country, the relative ease of access to sources of proof factor remains in the transfer analysis."[54] Instead, Powerhouse argues that this Court should analyze this factor "in light of the distance that documents, or other evidence, must be transported from their existing location to the trial venue."[55] Powerhouse claims that 2,300 pages of documents have been produced in relation to this action and are warehoused at its office in Benicia, California,

---

[49]   *Id.* at p. 13 (emphasis in original).

[50]   *Id.* at p. 14.

[51]   *Id.*

[52]   *Id.* at p. 15 (citing *In re Genentech*, 566 F.3d 1338, 1344 (Fed. Cir. 2009) (en banc)).

[53]   *Id.* at p. 16.

[54]   *Id.* (citing *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1199 (Fed. Cir. 2009)).

[55]   *Id.* (citing *Optimum Power Solutions LLC v. Apple, Inc.*, 794 F.Supp. 2d 696, 700-01 (E.D. Tex. 2011)).

and that Phase One of the Agreement took place in the Northern District of California.[56] In contrast, Powerhouse asserts that no evidence is located in the Eastern District of Louisiana.[57]

Next, Powerhouse argues that "the availability of compulsory process favors transfer" of this action to the Northern District of California.[58] Powerhouse emphasizes that "none of the 21 potential trial witnesses disclosed by the parties live in this District, within 100 miles of this District, or in Louisiana," meaning that these individuals are "not amendable to service of a subpoena to appear at trial in this Court."[59] In contrast, ten of the witnesses would be under the subpoena power of the Northern District of California, and therefore their presence could be secured.[60] Moreover, four of the disclosed witnesses who reside in the Northern District of California are not employed by Powerhouse, and "it is uncertain whether those witnesses would appear to testify at trial in the absence of a subpoena."[61]

Powerhouse also contends that "the interest in having local interests decided at home favors transfer of this action to the Northern District of California."[62] Powerhouse argues that this District "has no connection [to] the parties, underlying events, or percipient witnesses," whereas "the events

---

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at p. 17.

[60] *Id.*

[61] *Id.*

[62] *Id.* at p. 18.

giving rise to this action took place [in the Northern District of California and] one party and approximately half of all disclosed witnesses are located [there]."[63]

Concerning this District's connection to the present matter, Powerhouse avers that "transfer is warranted because this district has no meaningful connection to this action."[64] Citing authority from the United States Court of Appeals for the Federal Circuit, Powerhouse maintains that "in a case featuring most witnesses and evidence closer to the transferee venue with few or no convenience factors favoring the venue chosen by the plaintiff, the trial court should grant a motion to transfer."[65]

In addition, Powerhouse argues that this motion is timely, even though this action was originally filed in September 2011, because the pleadings were not settled until July 2012, and in fact, the claims were dismissed in May 2012.[66] Moreover, the parties only submitted their witness lists on July 5, 2012, and the location of those witnesses forms the basis of Powerhouse's reasons for transfer. In conclusion, Powerhouse states that, "the transfer of this action would not result in any undue delay or prejudice. Discovery has only just commenced. Written discovery has been served, but not yet answered by UOS. No depositions have been noticed or taken. No contested motions have been filed in this action."[67]

In opposition, UOS argues that Powerhouse has not met its burden to show good cause that the transferee venue is clearly more convenient. UOS stresses that Powerhouse has only considered

---

[63]   *Id.*

[64]   *Id.*

[65]   *Id.* (citing *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1198 (Fed Cir. 2009); *In re Hoffman-La Roche, Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009)).

[66]   *Id.* at p. 19.

[67]   *Id.*

the convenience of its witnesses.[68] Moreover, UOS maintains that Powerhouse has not shown that the plaintiff, UOS, would not be substantially inconvenienced by the transfer– a burden it must meet to be successful on the pending motion.[69] In addition, UOS argues that "plaintiff's choice of venue is to be given appropriate deference."[70]

Considering the relative ease of access to sources of proof, UOS refutes Powerhouse's assertion that no evidence is located in this District. UOS argues that "[t]he crux of this case is the dilatory and faulty work performed on the M/V MARY ANN HUDSON and her engines, which are the main physical evidence in this case. The vessel regularly calls between ports within this District and Tampa, Florida... [The vessel will be] available for inspections and testing here."[71] In addition, UOS claims that the electronic availability and transfer of documents makes the "stored" location immaterial in assessing convenience, and emphasizes that "[Powerhouse] has identified no physical evidence located in California."[72] UOS contends that because "the vast majority of the physical evidence and documents are not maintained solely in or near California, this factor is neutral and therefore does not support a transfer of venue to California."[73]

Next, in contemplation of the convenience of the witnesses, UOS avers that "the party seeking a transfer for convenience of witnesses must clearly specify the key witnesses and make a

---

[68] Rec. Doc. 58 at p. 7.

[69] *Id.* at pp. 7-8 (citing *Columbia Energy Servs. Corp. v. TDC Energy Corp.*, No. 01-0055, 2002 WL 272382, at * 2 (E.D. La. Feb. 25, 2002) (Porteous, J.)).

[70] *Id.* at p. 8 (citing *Volkswagen*, 545 F.3d at 315).

[71] *Id.* at p. 9.

[72] *Id.* at pp. 9-10 (emphasis in original).

[73] *Id.* at p. 10.

general statement of what their testimony will cover. Without a specific showing of what the testimony of the named witnesses may be, a court may not consider those witnesses in its decision regarding the witnesses' convenience."[74] In addition, UOS argues that "courts consider employees of a party to be so closely aligned with that party that they are presumed willing to testify in either forum, despite any inconvenience it may entail." Of the eight witnesses referenced by Powerhouse, UOS argues that "all but one are either still employed by [Powerhouse] or currently performing work for [Powerhouse]."[75] UOS points out that this remaining witness, Mr. Brennan, "is a former employee of defendant" and "voluntarily provided a Declaration to Powerhouse Diesel's request," and therefore it concludes that he is closely aligned with Powerhouse.[76] UOS acknowledges two remaining witnesses who do not work for Powerhouse and reside in California, but aver that their "testimony can be perpetuated easily in California if they refuse to travel."[77] UOS outlines the remaining nine witnesses who live in Florida, Texas, and New Orleans (one witness) and compares the total travel differential for these witnesses that a transfer to California would entail; each location's witnesses would incur more travel miles if transfer were granted.[78] In addition, UOS stresses that these nine witnesses are not under the subpoena power of the Northern District of California.[79]

---

[74]  *Id.* at p. 11 (citing *Cyprus Drilling, Inc. v. Griffin*, No. 06-0556, 2006 WL 2177992 (W.D. La. July 31, 2006)).

[75]  *Id.* at p. 12.

[76]  *Id.*

[77]  *Id.* at p. 13.

[78]  *Id.* at pp. 13-17.

[79]  *Id.* at p. 17.

Next, UOS addresses other practical issues that it claims would make trial easy, expeditious and inexpensive in this District as compared to the Northern District of California. UOS claims that judicial economy "dictates maintaining the suit here."[80] UOS argues that transfer would result in a third continuance of the trial date. Moreover, UOS cites data that suggest that the Northern District of California has a longer median "time from filing to disposition by trial" than this District.[81]

UOS also maintains that Powerhouse has failed to show that "this Court's docket is so congested as to make it incapable of providing a speedy adjudication of this matter. To the contrary, the parties have an assigned trial date, only eight months away from now, and this District has the shortest disposition of the three possible venues."[82] In addition, UOS claims that because the vessel "regularly calls within this District where she will undoubtably undergo inspection, New Orleans has a local interest in the lawsuit."[83] Moreover, UOS asserts that this case should be maintained here because the issues are  governed by maritime law, with which this District's judges are uniquely familiar, and because all three possible venues have a local interest in the litigation, rendering this factor neutral.[84]

UOS also avers that the pending motion should be denied because of Powerhouse's delay in filing, stressing that this lawsuit has been pending for over a year. Moreover, UOS argues that the majority of Powerhouse's articulated reasons for seeking transfer are based on *its* witnesses –

---

[80] *Id.*

[81] *Id.* at pp. 17-18.

[82] *Id.* at p. 18. The third district referred to is the Middle District of Florida.

[83] *Id.*

[84] *Id.* at p. 19.

information it had before the witness lists were filed into the record. UOS opines that this motion is "nothing more than a dilatory tactic, which is a ground for denial." [85]

In the alternative, UOS, while still maintaining that the suit should remain in this District, asks that this Court consider transfer instead to the Middle District of Florida, because the "underlying events relevant to the litigation occurred there, a number of documents and witnesses are located there, the vessel at issue calls there, [and] UOS is located there."[86] UOS maintains that the suit could have initially been filed in the Middle District of Florida and that the court would have subject matter and personal jurisdiction over Powerhouse.[87]

In reply, Powerhouse asserts that UOS does not dispute that this case could have intially been filed in the Northern District of California, thus satisfying the initial hurdle in obtaining a transfer of venue.[88] Turning to convenience, Powerhouse argues that "UOS concedes that there are no percipient witnesses located in this District, or anywhere in Louisiana for that matter."[89] Moreover, Powerhouse asserts that "UOS conflates two entirely separate factors (the convenience/cost factor and the court's compulsory process factor), and in so doing completely misstates the applicable law."[90] Specifically, Powerhouse refutes UOS's argument that the eleven witnesses located in or near the Northern District of California should not be considered for cost and convenience purposes because they are "willing" witnesses. Powerhouse claims that the cases cited by UOS actually

---

[85] *Id.* at p. 20.

[86] *Id.*

[87] *Id.* at p. 21.

[88] Rec. Doc. 62 at p. 2.

[89] *Id.*

[90] *Id.*

concern witnesses who are employed by a party and are therefore considered "willing" and not considered in respect to the factor that examines the court's ability to compel the attendance of the witness. However, Powerhouse contends that the case law does not support excluding these witnesses from consideration when analyzing the cost and inconvenience that would be imposed on these witnesses.[91] Powerhouse further maintains that UOS's conflation would "def[y] basic logic ... [b]ecause it is only 'willing' witnesses who are prepared to travel to a distant forum, it is only 'willing' witnesses who might suffer an inconvenience. In contrast, 'unwilling' witnesses do not face the prospect of traveling to a distant court as (by definition) they are unwilling to do so."

Next, Powerhouse rejects UOS's argument that Powerhouse's failure to include a general statement of the witnesses' testimonies should preclude the Court from granting the pending motion; Powerhouse argues that this is contrary to United States Supreme Court and Fifth Circuit precedent.[92] Powerhouse reiterates its contention that the Northern District of California is "clearly a more convenient and appropriate forum." However, Powerhouse concedes that the proposed transfer poses a "relatively minor" difference in the convenience for the four Florida and three Texas witnesses, who regardless would have to travel by plane to attend trial; however, the convenience to the California witnesses is significantly reduced by trial in the Northern District of California.[93]

Moreover, Powerhouse maintains that despite technology facilitating the easy transfer of documents, the physical location of these documents is still considered in the overall analysis.[94]

---

[91]   *Id.* at p. 4.

[92]   *Id.* at p. 5 (citing *Piper Aircraft Co.* 454 U.S. at 258; *Volkswagen*, 545 F.3d at 317, n. 12).

[93]   *Id.* at p. 6.

[94]   *Id.* at p. 7.

16

Powerhouse also disputes the relevance of the vessel as the "main physical evidence in this case," which UOS asserted in the motion in opposition. "UOS's claims in this case are for liquidated damages based on Powerhouse's alleged failure to timely complete work performed in Benicia, California and Veracruz, Mexico and for damages allegedly sustained by UOS in connection with its hiring of workers to replace Powerhouse on the job. UOS's self-serving contention that [the] vessel is relevant evidence in this case is further belied by UOS's own initial disclosures, in which UOS made no mention of the vessel or its engines, despite UOS's obligation to describe all tangible things that support its claims or defenses."[95] Regardless, Powerhouse contends that even if the vessel is relevant evidence a pre-trial inspection would not be impeded by transferring the action to the Northern District of California.[96]

Powerhouse reasserts that the compulsory service of process factor favors the requested transfer because "there are four California witnesses who do not work for Powerhouse and whose willingness to appear at trial in the absence of a subpoena is uncertain," whereas the Northern District of California would have the power to compel the attendance of these witnesses. In addition, Powerhouse maintains that the local interest factors favor transfer, because "all of the events at issue in this litigation occurred in Benicia, California, (or outside the United States altogether in Veracruz, Mexico)."[97] While UOS maintains that one of its employees inspected the vessel in New Orleans, Powerhouse argues that this "has no bearing or relevance to any of the issues in the case."[98]

---

[95] *Id.* at pp. 7-8.

[96] *Id.* at p. 8.

[97] *Id.*

[98] *Id.* at pp. 8-9.

17

Powerhouse also challenges UOS's contention that its motion is untimely, maintaining that "delay is not a controlling factor in a motion to transfer," and in fact, a motion to transfer should not be brought until the issues in the case are sufficiently refined, which may only occur after some discovery.[99] Powerhouse reiterates the procedural history of this matter, focusing on the fact that the UOS's claims were dismissed without prejudice in May 2012, and only pled correctly as of June 2012; no substantive motions have been filed and "written discovery has just commenced."[100]

In addition, Powerhouse opposes UOS's alternative request to transfer this action to the Middle District of Florida.[101] First, Powerhouse maintains that this request is not properly before the Court as only raised in a brief in opposition, and argues that time constraints and page limitations limit the effectiveness of Powerhouse's to respond. However, Powerhouse asserts that the Middle District of Florida is not a proper venue under a Section 1404(a) analysis and should therefore be denied.[102]

## IV. Analysis

As a threshold matter, this Court finds that this case could have been originally filed in the Northern District of California. UOS's claims implicate general maritime law and therefore trigger federal subject matter jurisdiction. Moreover, Powerhouse resides in the Northern District of California, availing it to the personal jurisdiction of that court. While subject matter jurisdiction

---

[99] *Id.* at p. 9 (citing *Poncy v. Johnson & Johnson*, 414 F.Supp. 551, 557 (S.D. Fla. 1976)).

[100] *Id.* at pp. 9-10.

[101] *Id.* at p. 10.

[102] *Id.* at pp. 10-11.

cannot be waived, it should be noted that it is not disputed that the case could have originally been filed in the Northern District of California. In fact, in opposition to the pending motion, UOS argues that "this District [the Eastern District of Louisiana] has the shortest disposition time of the three possible venues [the other two being the Middle District of Florida and the Northern District of California],"[103] conceding that the Northern District of California would have been a permissible venue.  As this case could have been filed in the Northern District of California, the Court may consider the pending motion to transfer to the Northern District of California.

However, before a full analysis of the convenience factors, the Court will address UOS's argument that the pending motion fails because Powerhouse has declined to provide the Court with affidavits outlining how witnesses testimonies are relevant. Powerhouse cites *In re Volkswagen of America*,[104] where the Fifth Circuit reviewed a request for a transfer of venue under 1404(a),[105] to claim that such affidavits are not required. In that case, the moving party in fact provided two affidavits from witnesses stating that travel to the original venue would be inconvenient.[106] The nonmoving party complained that the movant "ha[d] not provided affidavits from these individuals indicating what specific testimony they might offer [or] explained why such testimony is important or relevant."[107] The Fifth Circuit noted that in the *forum non conveniens* context they had "rejected the imposition of a blanket rule requiring affidavit evidence."[108] Moreover, the Fifth Circuit

---

[103]   Rec. Doc. 58 at p. 18.

[104]   545 F.3d 304 (5th Cir. 2008).

[105]   *Id.* at 308-09.

[106]   *Id.* at 317.

[107]   *Id.* n. 12.

[108]   *Id.* (internal quotations omitted).

ultimately granted a petition for mandamus ordering the district court to transfer the action, despite these alleged evidentiary deficiencies.[109] Therefore, it is clear that the lack of affidavit evidence describing the testimony of witnesses is not fatal to a request for transfer under 1404(a). The Court may now address and balance the private and public convenience factors required under the Fifth Circuit precedent in *Volkswagen*.

### A. Private Factors

#### 1. Relative Ease of Access to Sources of Proof

Powerhouse maintains that this factor supports transfer because many of its documents are warehoused in California, but UOS seeks to discount this fact based upon technological advances that provide for easier electronic availability of documents. The Fifth Circuit has squarely addressed this argument. In *In re Volkswagen of America, Inc.*,[110] the district court found that "the relative ease of access to sources of proof is neutral because of advances in copying technology and information storage." On appeal, the Fifth Circuit rejected this analysis, reasoning that "the district court's approach reads the sources of proof requirement out of the § 1404(a) analysis."[111] "That access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous." The Fifth Circuit held that the district court erred in not applying this factor "because it d[id] weigh in favor of transfer."[112] Therefore, this Court

---

[109]   *Id.* at 306.

[110]   545 F.3d 304 (5th Cir. 2008).

[111]   *Id.* at 317.

[112]   *Id.*

will take into account the 2,300 pages of documents in California as weighing in favor of the requested transfer.

However, UOS also contends that the vessel that is involved in this dispute calls in New Orleans, and therefore this factor weighs in favor of the Court retaining the suit in this District or, at the very least, renders this factor neutral. Powerhouse argues that the vessel is not relevant evidence to UOS's claims for timely completion of work and damages incurred by having to hire other workers to complete the job. In addition, Powerhouse points out that UOS did not list the vessel as evidence in its Rule 26 disclosures. Federal Rule of Civil Procedure 26(a)(ii) requires a party to disclose "a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."

If UOS's arguments are sincere, the vessel should have been listed as tangible evidence. Moreover, this Court fails to see the evidentiary value of the vessel to this case, where UOS's claims and Powerhouse's counterclaim do not concern the condition of the vessel, but rather alleged contractual breaches. The vessel appears to be a tangential aspect to this litigation. Moreover, UOS does not contend that the vessel is currently in this District, but rather that it often calls here. As such, even if this evidence were relevant, it is not present in this District and therefore should not be used to bolster the convenience of trying the case in this District. For these reasons, the Court finds that this factor weighs in favor of transfer.

### 2. Availability of Compulsory Process to Secure the Attendance of Witnesses

As Powerhouse noted in reply, this factor is distinct from the consideration of willing witnesses' convenience. "The second and third elements [of the 1404(a) analyses] involve the costs

[and convenience] associated with bringing ***willing*** witnesses to trial, and the availability of compulsory processes to bring ***unwilling*** witnesses to trial."[113] However, Powerhouse conflates "unwilling" with "non-employee." While these terms may sometimes overlap, they are not synonymous or interchangeable. Non-employees are not necessarily unwilling to testify. In *Laitram Corp. v. Hewlett-Packard Co.*,[114] another section of this Court acknowledged this distinction: "As the primary basis for its motion to transfer, [movant] argues that five key witnesses needed for its defense are not subject to the Court's subpoena power, are no longer employed by [movant], ***and will not voluntarily appear in New Orleans for trial***."[115] Relying on the United States Supreme Court in *Gulf Oil Corp. v. Gilbert*,[116] the *Laitram* court reasoned that a court's inability to present live witnesses for trial would create "a condition not satisfactory to the court."[117] It is only the absence of live testimony from trial that creates the inconvenience, and is irrelevant for purposes of this analysis whether the testimony is secured voluntarily or through subpoena. Therefore, in consideration of this factor, the Court should only consider a district court's ability to compel the appearance of non-employee witnesses who are unwilling to testify absent a subpoena.

None of the fact witnesses live in this District, whether employees or non-employees of Powerhouse, or live within 100 miles, rendering this Court unable to compel their appearance.[118] Ten witnesses would be under the subpoena power of the Northern District of California, including four

---

[113]  *TV-3 v. Royal Ins. Co. of Am.*, 28 F.Supp.2d 407, 412 (E.D. Tex. 1998) (emphasis added).

[114]  120 F.Supp.2d 607 (E.D. La. 2000) (Feldman, J.).

[115]  *Id.* at 610 (emphasis added).

[116]  330 U.S. 501 (1947).

[117]  120 F.Supp. 2d at 610.

[118]  Rec. Doc. 54-1 at p. 17.

22

who are not employed by Powerhouse. Powerhouse provides the declarations of eight witnesses; while all of the witness declarations state that testifying in this District would cause them grave inconvenience, none state that they would be unwilling to testify.[119] In fact, Powerhouse only alleges that securing these witnesses' testimony would be "uncertain."[120] Therefore, there is no evidence that the lack of compulsory process over Powerhouse's non-employee witnesses would prevent their testimony. Likewise, UOS has submitted several declarations from its witnesses, who all claim this District to be a more convenient forum than the Northern District of California, but similarly do not state that they would be unwilling to testify if this action were transferred.[121] In *Laitram*, the court found that the sworn declaration of an attorney in good standing attesting to the witnesses' unwillingness to appear in the transferor venue was sufficient to carry the movant's burden on this factor.[122] Neither parties' counsel has made such a declaration in this matter. As neither party has submitted evidence that its witnesses would be unwilling to testify in either venue, this factor is neutral.

### 3. Cost of Attendance and Convenience for Willing Witnesses

The Fifth Circuit has adopted the "100 mile rule" to assist in the analysis of this factor.[123] Under this rule, if the distance between the proposed venue and the current venue is more than 100 miles, the factor of inconvenience increases in direct relationship to the distance traveled.[124] This rule

---

[119]   Rec. Doc. 54; Exs. 1-7, 9.

[120]   Rec. Doc. 62 at pp. 5, 8.

[121]   Rec. Doc. 58; Exs. A, B, D, E.

[122]   120 F.Supp.2d at 609 n.2.

[123]   *Volkswagen*, 371 F.3d at 204-05.

[124]   *Id.* at 205.

favors transfer when the transferee venue is a shorter average distance from witnesses than the transferor venue. However, the "100 mile rule" should not be "rigidly applied." "When a particular witness will be required to travel 'a significant distance no matter where they testify,' then that witness is discounted for purposes of the '100 mile rule' analysis."[125] Where no potential witnesses are residents of the court's state, favoring the court's location as central to all of the witnesses is improper.[126] Finally, "this factor favors transfer when a 'substantial number of material witnesses reside in the transferee venue,' and no witnesses reside in the transferor venue regardless of whether the transferor venue would be more convenient for all of the witnesses."[127]

Powerhouse claims that ten fact witnesses live in California, lowering their cost of attendance and inconvenience were the action to be transferred to the Northern District of California. These witnesses include (1) Jimmie L. Jones, current President of Powerhouse; (2) Robert Johnson, current engineer for Powerhouse; (3) Lance Brock, a self-employed worker who provides engineering and quality control services for Powerhouse; (4) Anthony Brennan, former account for Powerhouse; (5) Patrick Jones, current Director of Business Development and Customer Relations for Powerhouse; (6) Robert Kaiser, a formerly self-employed consultant who provided services for Powerhouse; (7) Juliet Mandia, current field engineer for Powerhouse; (8) Glen Meier, current field engineer for Powerhouse; (9) Victorino Deguzman and (10) P.C. Wu, who are both ABS surveyors who live in California.[128]

---

[125] *Optimum Power Solutions LLC v. Apple, Inc.* 794 F.Supp. 2d 696, 701 (E.D. Tex. 2011) (quoting *Genetech*, 566 F.3d at 1344).

[126] *Id.*

[127] *Id.* (quoting *Genetech*, 566 F.3d at 1344-45).

[128] Rec. Doc 58 at p. 12; Rec. Doc. 54-1 at pp. 13.

UOS lists at least nine other witnesses it believes could testify in this matter: (1) Craig Windus, of Tampa, Florida, General Manager of UOS; (2) Stephen Seal, of St. Petersburg, Florida, who previously was Manager of Repairs for UOS; (3) David Whitehead, of Tampa, Florida, warehouse supervisor for UOS; (4) Neil McManus, of Tampa, Florida, Vice President of UOS; (5) John Binion, of Bandera, Texas, Chief Operating officer and Executive Vice president of United maritime Group, LLC (parent company of UOS); (6) Valsimis, Inc, a Houston based firm that performed labor involved in the engine overhaul of the M/V MARY ANN HUDSON; (7) Goltens, Miami, a Miami firm which provides machining services; (8) Joe Riva, of Houston, Texas, a surveyor of American Bureau Shipping; and (9) Nicholas Paternostro, of New Orleans, Louisiana, "who, at the request of UOS, examined the main engines of the M/V MARY ANN HUDSON during the overhaul."[129]

The convenience of employee witnesses is not weighed heavily in this analysis: "The relative convenience to the witnesses is often recognized as the most important factor to be considered in ruling on a motion under § 1404(a). It is the convenience of non-party witnesses, rather than that of employee witnesses, however, that is the more important factor and is accorded greater weight."[130] Therefore, Powerhouse has listed five relevant non-employee witnesses[131] who reside in California: Anthony Brennan, Victorino Deguzman, and P.C. Wu, Robert Kaiser, and Lance Brock. In contrast, UOS has listed only one witness, Nicholas Paternostro, an expert, who resides in this District.

---

[129] *Id.* at pp. 13-16.

[130] *Gundle*, 844 F.Supp. at 1166.

[131] Powerhouse claims that is has listed only four non-employee witnesses who reside in the Northern District of California. Rec. Doc. 54-1 at p. 17. However, it is unclear exactly who this witnesses are, and Powerhouse never identifies them expressly.

However, "[t]he convenience of expert witnesses weighs little in the [1404(a)] analysis."[132] While UOS names several other non-employee witnesses, and while they may reside closer to this District, they do not in fact reside in this District or state. They would all have to travel over 100 miles if this case remained in this District. In addition, as explained above, when potential witnesses reside in the transferee district and none reside in the transferor district or state, this factor favors transfer.

In addition, the convenience of employee witnesses is "not regarded heavily" but is not fully disregarded. Powerhouse has listed more relevant employee witnesses who would be inconvenienced by trial in this District than UOS has claimed would by inconvenienced by trial in the Northern District of California. Therefore, the Northern District of California has more non-employee witnesses who reside in that district. Only an expert witness, who is not to be considered, resides in this District or state. Moreover, while not weighed heavily, several Powerhouse employee-witnesses reside in the Northern District of California while UOS has no employee witnesses that reside in this District. As such, this factor weighs in favor of transfer.

*4. All Other Practical Problems That Make Trial of a Case Easy, Expeditious, and Inexpensive*

UOS is alone in addressing this factor directly. Its main argument is that transfer would cause a third continuance of the trial date. While this is almost certainly true, it should be noted that much of the delay in this matter has been as a result of UOS's failure to plead properly. To allow them to defeat transfer on this ground would be unjust. Moreover, the prior two continuances were jointly requested by Powerhouse and UOS, and as such cannot be used now in UOS favor and to

---

[132] *Houston Trial Reports, Inc. v. LRP Pubs., Inc.*, 85 F.Supp.2d 663, 669 (S.D. Tex. 1999).

Powerhouse's detriment.  Therefore, this factor is either neutral or only weighs slightly in favor of not transferring the action.

**B. Public Factors**

*1. Administrative Difficulties Flowing From Court Congestion*

UOS has provided data that the Northern District of California has a longer median time from filing to disposition by trial than this District. Powerhouse has not refuted this claim. As such, this factor weighs in favor of allowing the suit to remain in this District.

*2. The Local Interest in Having Localized Interests Decided at Home*

Powerhouse emphasizes that none of the alleged events in dispute in this matter occurred in this District, nor do any of the parties reside in this District; in contrast, one of the parties (Powerhouse) and many of the witnesses, reside in or near the Northern District of California and Phase One of the Agreement occurred there as well. UOS's only response to this claim is that this District has a local interest is that the vessel in question "regularly calls within the District where she will undoubtably undergo inspection." Even if that created a local interest, it is doubtful that it would overtake the Northern District of California's interest in this matter arising from defendant Powerhouse's residence in the district and the events forming part of the dispute occurring there. Therefore, this factor favors transfer.

*3. The Familiarity of the Forum with the Law that Will Govern the Case*

Again, only UOS expressly considers this factor, and asserts that because this case is governed by maritime law, this District is uniquely familiar with the law at issue. However, this consideration has usually been taken into account when the law to be applied would be state law

27

based on a federal court's diversity jurisdiction.[133] This makes sense as this District would likely be more familiar with the state law of Louisiana, whereas the Northern District of California would likely be more familiar with the state law of California. However, maritime law is a federal matter, and both proposed districts here are federal courts. In fact, the very purpose of the Admiralty Clause of the Constitution is to maintain uniformity of maritime law within the United States.[134] While this District may see a good deal of maritime cases, the Northern District of California contains San Francisco, of which significant maritime activity also takes place. As such, this factor is neutral in this analysis.

*4. The Avoidance of Unnecessary Problems in Conflict of Laws or in the Application of Foreign Law*

This factor is not relevant in this matter, as uniform federal maritime law will apply.

**C. UOS's Other Arguments in Opposition**

UOS contends that the pending motion should be denied because it was filed after this action had been pending for over a year. However, as this Court has already outlined, UOS's claims were dismissed without prejudice in May of 2012 for UOS's repeated failure to properly plead jurisdictional facts. The Court will not hold this against Powerhouse. Finally, in opposition to the pending motion, UOS asks in the alternative to granting the motion to transfer to the Northern District of California, that this Court consider transferring this action to the Middle District of Florida. However, a motion requesting this relief is not before the Court, and therefore the Court will not consider this as an alternative.

---

[133]   *See Van Dusen*, 376 U.S. at 643.

[134]   *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447 (1994).

## V. Conclusion

Upon analyzing the private and public factors, Powerhouse has made a compelling case that transfer is warranted here. Three of the factors are clearly in favor of transfer, while only one factor (administrative difficulties flowing from court congestion) marginally supports UOS's position to retain the action in this District. Specifically, this Court finds that Powerhouse has demonstrated that transfer is warranted because it will facilitate easier access to sources of evidence, it will reduce the cost of attendance of willing witnesses, and because Powerhouse resides in the Northern District of California, local interests are best served by trial in that district; in contrast, this District has no meaningful local interest in this matter. Three of the other factors are neutral, and one is not applicable. Therefore, Powerhouse has met its burden to demonstrate that its proposed transfer would be to a substantially more convenient venue than this District, and therefore the Court will grant the pending motion. Accordingly,

**IT IS HEREBY ORDERED** that Powerhouse's Motion to Transfer Venue[135] is **GRANTED**;

**IT IS FURTHER ORDERED** that this action is **TRANSFERRED** to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. § 1404(a).

**NEW ORLEANS, LOUISIANA**, this  8th  day of March, 2013.

_Nannette Jolivette Brown_
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[135]  Rec. Doc. 54.